IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>TALANTE FISHER-BLAND | CRIMINAL ACTION NO.<br><br>1:17-cr-00069-SCJ-CMS-1 |

## **REPORT AND RECOMMENDATION**

On February 21, 2017, a grand jury sitting in the Northern District of Georgia returned a multi-count indictment against Talante Fisher-Bland ("Defendant") and five other individuals for charges relating to the purchase and sale of firearms. [Doc. 1]. Specifically, Defendant was charged with three counts of aiding and abetting another in making material false statements to a federally licensed firearms dealer, in violation of 18 U.S.C. § 922(a)(6) and §2, and three counts of aiding and abetting the transfer of firearms to an out-of-state resident, in violation of 18 U.S.C. § 922(a)(5) and §2. [Id.]. Defendant has filed a Motion to Suppress Evidence, in which he seeks to suppress all evidence obtained during a warrant-authorized search of his residence. [Doc. 75]. For the reasons discussed below, I **RECOMMEND** that the motion be **DENIED**.

### **I.  FACTS**

On February 28, 2017, United States Magistrate Judge Alan J. Baverman

signed a search warrant for Defendant's residence, 105 Concord Terrace, McDonough, Georgia, 30253 (the "Warrant"). [Doc. 122-1].[1] The application for the Warrant was supported by an Affidavit signed by Special Agent Jonathan P. Gray of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") (the "Affidavit"). [Doc. 93-1]. The Affidavit states that on August 15, 2016, Brittni Dixon and Martavius Askew purchased multiple firearms from the Liquidation Outlet, a federally licensed firearm dealer in Georgia. [Id. ¶¶ 12-14]. Ms. Dixon purchased thirteen firearms, and Mr. Askew purchased ten. [Id. ¶¶ 12, 14-16, 18, 20]. Several of these weapons were later recovered by police in Rochester, New York, in connection with criminal activity. [Id. ¶¶ 17, 19, 30, 40, 48].

According to the Affidavit, Special Agent Gray's investigation revealed that Defendant drove both Ms. Dixon and Mr. Askew to the Liquidation Outlet on August 15, 2016 to purchase the guns. [Doc. 93-1 ¶ 22]. Ms. Dixon participated in the gun purchase at the request of Defendant's girlfriend, Artia Woolfork, who had asked Ms. Dixon to help Defendant buy a firearm. [Id. ¶ 21]. Ms. Dixon told Special Agent Gray that on August 15, 2016, Defendant picked her up in a black car, and Martavius Askew was in the passenger seat; Defendant drove them to the

---

[1] The Warrant also authorized a search of Defendant's car, a 2014 Chrysler 200 LX reportedly belonging to Defendant. The portion of the Warrant related to the car is not at issue in the Motion to Suppress Evidence.

Liquidation Outlet. [Id. ¶¶ 22-23]. Upon arriving at the Liquidation Outlet parking lot, they met five individuals who were introduced to Ms. Dixon as "people from New York." [Id. ¶ 23]. At this point, Ms. Dixon was told that Defendant wanted her to purchase several firearms for the people from New York. [Id. ¶ 24]. Ms. Dixon told Special Agent Gray that the New York people selected which firearms that Ms. Dixon was to buy, and one of the New York people paid the store clerk for the guns. [Id. ¶ 25]. According to Ms. Dixon, she never touched the guns or the money during the transaction. [Id.].

On October 3, 2016, Special Agent Gray interviewed Defendant's girlfriend, Artia Woolfork, who told him that the firearms purchased on August 15, 2016 were for the New York people, who planned to take the guns to New York. [Doc. 93-1 ¶¶ 32-34]. She also stated that Defendant and Mr. Askew were each being paid to purchase the guns. [Id. ¶ 34]. Ms. Woolfork also told Special Agent Gray that she thought Defendant had previously sold four of his personal firearms to the people from New York sometime between March and August of 2016. [Id.].

On October 17, 2016 Special Agent Gray interviewed Martavius Askew about his involvement in the August 15th firearms purchases. [Doc. 93-1 ¶ 42]. During this interview, Mr. Askew stated that he had filled out the paperwork for the August 15th firearms purchase at the direction of Defendant. [Id. ¶¶ 43-44].

3

According to Mr. Askew, after the purchase was made, he gave the box of firearms to the New York people. [Id. ¶ 46]. Mr. Askew denied receiving any compensation for his participation in the purchase. [Id. ¶ 44].

In September 2016, Special Agent Gray reviewed a Facebook page depicting Defendant in various poses with firearms and confirmed that Defendant had purchased two guns early in 2014, a SCCY Industries pistol and a Glock Pistol. [Doc. 93-1 ¶¶ 31, 37]. He also confirmed that Defendant was not licensed to import, manufacture, deal, or collect firearms or ammunition. [Id. ¶ 47]. The following month, Special Agent Gray interviewed Defendant at his residence (the target location of the Warrant) and spoke with Defendant in the foyer of his house. [Id. ¶ 35]. When asked if he had purchased any firearms recently, Defendant stated that he owned a couple of Glock pistols, and then stated that he wanted an attorney. [Id. ¶ 36].

Special Agent Gray's Affidavit closed by stating that Defendant had been indicted the week before (on February 21, 2017) with "multiple violations of federal firearms laws," and that indictment was under seal, meaning that Defendant was not aware of it. [Doc. 93-1 ¶ 49]. According to Special Agent Gray, "[w]hile

4

under felony indictment, [Defendant] is prohibited from possessing firearms."[2] [Id. ¶ 50].

The application for the search warrant was presented to Judge Baverman seven days after the indictment was returned, on February 28, 2017, and Judge Baverman signed it that day. The Warrant authorized law enforcement to seize the following items:

    a.    Talente Ravon FISHER-BLAND, B/M, DOB 09/08/1992, 5'10, 137 pounds.

    b.    Any and all firearms and ammunition.

    c.    Any and all ledgers, paperwork, receipts, manuals, or documents in any and all media formats regarding the theft, purchase, sale, or transfer of firearms and ammunition.

    d.    Any and all containers, boxes, or packaging bearing firearms or ammunition information.

    e.    Any and all applications or membership cards associated with firearms related clubs or shooting ranges.

    f.    Any and all photographs in any and all media formats, targets, or spent cartridge casings consistent with shooting or firearms related activity.

---

[2] The Government has since conceded that Special Agent Gray's statement that Defendant was prohibited from possessing firearms as of the date of his indictment was incorrect.

  g. Any and all paperwork, identifications, or documents that are indicia of ownership or occupancy at 105 Concord Terrace, McDonough, Georgia 30253.

  h. Any and all cell phones or electronic media devices identified as being used by Talante FISHER-BLAND.

[Doc. 93-1 at 19; Doc. 122-1]. The Warrant stated that these items could constitute evidence of a crime, specifically violations of 18 U.S.C. § 922(a)(5) (providing firearms to non-state resident), 18 U.S.C. § 922(a)(6) (providing false information to a federally licensed firearms dealer), and 18 U.S.C. § 371 (conspiracy to commit a federal crime). [Doc. 93-1 at 1].

## II. DISCUSSION

In his Motion to Suppress Evidence, Defendant argues that the Warrant was issued without probable cause for two reasons: (1) the information upon which the Affidavit was predicated was stale; and (2) there was no nexus shown between the items to be seized and Defendant's residence. [Doc. 75].

**A. Staleness**

Defendant first argues that the information upon which the Affidavit relies is too old to support probable cause because more than six months had elapsed between the date of the gun purchase (August 15, 2016) and the date the warrant was issued (February 28, 2017). [Doc. 118 at 8-9]. Defendant argues that this time lapse makes it "highly unlikely—not even close to probably" that any of the

contraband listed in the Warrant as an item to be seized would be found at his residence in February 2017. [Id. at 9].

"For probable cause to exist . . . the information supporting the government's application for a search warrant must be timely . . . . [P]robable cause must exist when the magistrate judge issues the search warrant." United States v. Harris, 20 F.3d 445, 450 (11th Cir. 1994), *holding modified by* United States v. Toler, 144 F.3d 1423 (11th Cir. 1998). In determining if information is stale, the Court must look at the unique facts of each case. Id. at 450. As a result, "[t]here is no particular rule or time limit for when information becomes stale[.]" United States v. Truitt, No. 1:14-CR-0393-AT, 2015 WL 2452944, at *11 (N.D. Ga. May 13, 2015) (quoting United States v. Bervaldi, 226 F.3d 1256, 1265 (11th Cir. 2000)). When looking at the unique facts of a case, the Court must consider the "nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched." Bervaldi, 226 F.3d at 1265 (quoting Harris, 20 F.3d at 450). Based on the facts presented in this case, I conclude that the information contained in the Affidavit was not stale at the time Judge Baverman signed the Warrant.

First, with respect to the six and a half month time period, the Eleventh Circuit has routinely upheld search warrants predicated on information that was equally old, or older, than six months. See Bervaldi, 226 F.3d at 1264 (upholding a warrant based on more than six-month-old information); United States v. Domme, 753 F.2d 950, 955 (11th Cir. 1985), *holding modified by* United States v. Dennis, 786 F.2d 1029 (11th Cir. 1986) (holding that nearly six-month-old information concerning criminal activity was not stale); United States v. Lovvorn, 524 F. App'x 485, 487 (11th Cir. 2013) (determining that nine-to-twelve month old information was not stale). I conclude that this factor either weighs against a finding of staleness or, at best, is neutral.

Second, in terms of the nature of the suspected crime, courts allow a longer period of time to elapse between information being gathered and a search warrant being issued where the crime under investigation is ongoing or longstanding. See United States v. Degaule, 797 F. Supp. 2d 1332, 1356 (N.D. Ga. 2011) (citing United States v. Batiste, No. 06-20373-CR, 2007 WL 2412837, at *17 (S.D. Fla. Aug. 21, 2007)). "[W]here an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time. On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance." Bervaldi, 226 F.3d at 1265

8

(citation omitted). Here, the Affidavit presented some evidence that Defendant's involvement in illegal gun sales was not a one-time incident. The Affidavit contained facts showing that Defendant helped facilitate the purchase of weapons on August 15, 2016 and had previously sold four of his own personal weapons to out-of-state purchasers before that date. [Doc. 93-1 ¶ 34]. This evidence, coupled with Defendant's admission on October 3, 2016, that he had "a couple of Glock pistols," could show that Defendant was engaged in ongoing criminal activity.

Defendant downplays the information provided by Defendant's girlfriend, blames the agent for not providing corroborating information about the four-gun sale, and states that Defendant has no criminal history and had a carry permit. [Doc. 118 at 10-11]. These arguments miss the mark. Special Agent Gray stated, under oath, that Defendant's girlfriend told him that Defendant "may have sold four of his personal firearms to the subjects from New York." [Doc. 93-1 ¶ 34]. Her information was specific: she said that she thought Defendant had sold <u>four</u> of his own guns to people from <u>New York</u> sometime between <u>March and August of 2016</u>. [<u>Id.</u>]. While Defendant may dispute the fact that he sold four of his personal guns to people in New York, it was not unreasonable for Special Agent Gray to include this information in his Affidavit or for Judge Baverman to rely on it in making his probable cause determination. Moreover, while there may be nothing

9

to corroborate the evidence of the prior sale, there also is nothing to indicate what motive Defendant's girlfriend might have had to lie. This evidence supports the inference that the suspected criminal activity was not just a one-time incident, and in such cases, the Eleventh Circuit has found information in search warrant applications of even lengthier delays not to be stale based upon the particular facts and circumstances of those cases. See e.g., Bervaldi, 226 F.3d at 1264-69 (narcotics, six months); United States v. Hooshmand, 931 F.2d 725, 735-36 (11th Cir. 1991) (medicaid fraud, eleven months). This factor weighs against a finding of staleness.

Third, with respect to the character of the items sought, including firearms and documents tracking weapon sales and monetary proceeds, courts have upheld warrants for such evidence, concluding that such items are likely to remain in a suspect's home for an extended period of time. See United States v. Piloto, No. 12-20710-CR, 2013 WL 12080746, at *9 (S.D. Fla. Feb. 5, 2013), subsequently aff'd, 562 F. App'x 907, 913 (11th Cir. 2014) (quoting United States v. Gaines, 127 F.3d 1109 (10th Cir. 1997) (holding that firearms and ammunition have been understood to be the types of items that tend to remain in a suspect's home for long periods of time)); United States v. Pritchett, 40 F. App'x 901, 906 (6th Cir. 2002) ("Firearms are durable goods and might well be expected to remain in a criminal's

possession for a long period of time."). This factor, at least with respect to firearms, weighs against a finding of staleness.

Finally, the Warrant authorized the search of Defendant's residence. The "nature and function" of a house, "generally is not transitory or ephemeral, but instead endures for some length of time." Bervaldi, 226 F.3d 1256, 1265 (11th Cir. 2000). This factor weighs against a finding of staleness.

Each of the factors for determining staleness—the length of time, the nature of the alleged illegal activity, the character of the things sought, and the nature and function of the place—either are neutral or weigh in favor of a finding that the information in the Affidavit was not stale.

## B. Nexus Between Defendant's Home and the Crime

Defendant next argues that even if the information was not stale, "the [A]ffidavit provided no information to indicate that contraband or evidence connected to the crimes would be found in Mr. Fisher-Bland's residence." [Doc. 75 at 2]. Defendant contends that because the firearms purchased on August 15, 2016 were immediately transferred to the New York people, there is nothing in the Affidavit that would suggest that evidence of a crime would be found in Defendant's residence. [Id. at 3]. Moreover, Defendant takes issue with any assertion that probable cause existed merely based on the evidence that Defendant

11

possessed guns in his house. Defendant points out—and the Government concedes—that Special Agent Gray was mistaken when he stated in Paragraph 50 of his Affidavit that Defendant was not permitted to possess guns after his indictment.³ As such, Defendant maintains that there is no nexus between Defendant's residence and the alleged crime. [Doc. 118 at 12].

Indeed, the Affidavit did not include any facts tying Defendant's residence to criminal activity, nor did it include any catch-all opinion that the items to be seized were likely located in Defendant's residence. There are no facts in the Affidavit linking Defendant's home to any criminal activity. I recognize that Special Agent Gray states that based on his investigation and his experience, a search of Defendant's residence was supported by probable cause, but I am troubled by the conclusory nature of this opinion. [Doc. 93-1 ¶¶ 7, 35, 39]. He also opined that straw purchasers typically maintain notes and ledgers, and that straw purchasers also use cell phones and computers, but he provides no opinion about whether such items are typically kept in criminals' homes. [Doc. 93-1 ¶¶ 7-

---

³ The Government perpetuated this error in its initial brief, when it cited 18 U.S.C. § 922(n) and argued that "agents could not just let [Defendant] maintain possession of the firearms post-indictment since such possession would be illegal." [Doc. 93 at 10 n.1]. Defendant correctly points out that his indictment did not transform him into a prohibited person. Rather, 18 U.S.C. § 922(n) prohibits the sale, transfer or receipt of firearms while under felony indictment—not the possession of firearms. [Doc. 118 at 15].

12

11]. The only opinion Special Agent Gray provided regarding items expected to be found in Defendant's residence was the following: "I have learned through my training and experience that firearms traffickers and prohibited persons will regularly pose for photographs while in possession of firearms for posting on social media sites or for personal display in their residences." [Doc. 93-1 ¶ 11].

Concerned by the lack of a nexus between the alleged criminal activity and Defendant's home, I held oral argument on September 15, 2017. Following oral argument, the Government filed a supplemental brief on October 13, 2017. [Doc. 134]. In that brief, the Government argues that it is reasonable for the Court to infer the necessary nexus, citing United States v. Alfred, No. 1:16-cr-245-WSD-JFK, 2017 WL 3575004 (N.D. Ga. Aug. 17, 2017), a case in which another judge in this district found the necessary nexus under similar facts. [Id. at 2-5].

After careful consideration of this issue, I conclude that I need not resolve the issue one way or the other because it is evident that the Leon good faith exception would apply to save the Warrant, even if there was an insufficient nexus showing.

## C. Good Faith Exception

Even if the Warrant lacked the requisite showing of a nexus between the alleged criminal conduct and Defendant's home, Defendant's motion to suppress

must be denied on the basis of the good faith exception to the exclusionary rule articulated in United States v. Leon, 468 U.S. 897, 922 (1984). Leon held that even if a search warrant is ultimately found to be unsupported by probable cause, the Fourth Amendment will not bar the admission of evidence obtained by law enforcement officers if the officers were acting in reasonable reliance upon the search warrant. See United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002) (citing Leon, 468 U.S. at 922). The Eleventh Circuit interpreted Leon as follows:

> The Leon good faith exception applies in all but four limited sets of circumstances. . . . The four sets of circumstances are as follows: (1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "where the issuing magistrate wholly abandoned his judicial role in the manner condemned in Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 99 S. Ct. 2319, 60 L.Ed.2d 920 (1979); (3) where the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) where, depending upon the circumstances of the particular case, a warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."

Id. (internal citations omitted).

Defendant has argued, but not shown, that the warrant application was so deficient in establishing a nexus between the crime and the items to be seized so as to render official belief in the existence of probable cause "entirely unreasonable." [Doc. 118 at 16]. Additionally, Defendant has argued, in a conclusory manner,

that the Affidavit was "so lacking in probable cause no reasonable officer would presume it valid." [Id.]. Defendant, however, has presented no substantiating authority for these assertions. Rather, Defendant cites only to United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002), a case in which the good faith exception was upheld, to merely restate the Leon factors.[4] [Id.].

It is not "entirely unreasonable" to assume that persons involved with illegally selling and purchasing guns would keep items such as guns, ammunition, paperwork related to the sale and purchase of guns, cell phones, and photographs of gun-related activity, in their residence, where those items are readily accessible. Moreover, according to the Affidavit, Special Agent Gray knew from Defendant's own admission and the Facebook postings that Defendant was in possession of multiple firearms, and that there is evidence that on more than one occasion, Defendant had facilitated illegal gun sales to people in New York. [Doc. 93-1 ¶¶ 31, 34, 36-37]. While it may not have been a crime for Defendant to possess those guns, it is not unreasonable to conclude that such guns could be evidence of crimes related to their possible illegal sale and transfer. Finally, Special Agent

---

[4] At oral argument, I advised the parties that regardless of my ultimate conclusion regarding the staleness and nexus issues, I was inclined to apply the Leon good faith exception to the exclusionary rule. I noted the lack of authority in Defendant's brief for a contrary conclusion, and I gave Defendant the opportunity to supplement his brief. Defendant elected not to supplement his brief.

Gray averred that, through his training and experience, he had learned that "firearm traffickers will maintain notes, ledgers, journals, and/or documents for the purpose of tracking their weapon purchases/sales and monetary proceeds." [Doc. 93-1 ¶ 9]. Based on this knowledge, Special Agent Gray formed the professional opinion that the residence likely housed evidence of a crime. [Id. ¶ 7]. While he did not specifically opine that notes, ledgers, journals, and similar documents are likely to be kept in a person's residence, it is not unreasonable to make that inference.

Defendant attempts to discredit Special Agent Gray's expertise by noting that Defendant was not charged with trafficking firearms. [Doc. 118 at 14-15]. According to Defendant, the evidence in the Affidavit revealed, at most, that Defendant had recruited two people to be straw purchasers, which he distinguishes from firearm trafficking. [Id.]. I find this distinction unpersuasive. The Affidavit presented evidence that Defendant organized the illegal straw purchase of multiple firearms on August 15, 2016 and had illegally sold four guns on an earlier date. [Doc. 93-1 ¶ 34]. Even if Defendant was not ultimately charged with trafficking firearms, it was not unreasonable for Special Agent Gray to speak in terms of firearms trafficking when describing the type of evidence that he thought might be present at Defendant's home.

I find that the Leon good faith exception to the exclusionary rule applies, and there is no basis for suppression. See United States v. Martin, 297 F.3d 1308 (11th Cir. 2002).

### III.    CONCLUSION

For the foregoing reasons, I **RECOMMEND** that Defendant's Motion to Suppress Evidence [Doc. 75] be **DENIED**.

I have now addressed all referred pretrial matters and have not been advised of any impediments to the scheduling of a trial. Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO ORDERED**, this 16th day of November, 2017.

CATHERINE M. SALINAS
United States Magistrate Judge